# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

TOUCHSTONE GROUP, LLC on behalf of itself and all others similarly situated,

     Plaintiff,

v.

DANIEL J. RINK; TATUM, LLC; SFN GROUP, INC.; CHRISTOPHER FLANNERY; ASTOR, WEISS, KAPLAN, & MANDEL LLP; ESTILL & LONG, LLC; STEVEN GRANOFF, CPA; KRASSENSTEIN, GRANOFF & UNGER, LLC; CARBON DIVERSION, INC.; TRACS GROWTH INVESTMENT; AND JOHN DOES 1 - 100,

     Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff, Touchstone Group, LLC, individually and on behalf of all others similarly situated, for its Class Action Complaint, alleges the following based upon personal knowledge and its own acts, as well as upon information and belief as to all other matters based on their counsel's investigation of publicly available information:

## I.      NATURE OF THE ACTION

1.      This is an action brought under the federal, Pennsylvania, and Colorado securities laws, the Pennsylvania and Colorado Uniform Fraudulent Transfers Acts, and common law to recover damages from the defendants for injuries, losses, obligations and liabilities suffered by and imposed upon Plaintiff and the putative Class as a result of the Ponzi scheme orchestrated by Mantria Corporation and its related entities and affiliates ("Mantria") and Speed of Wealth, LLC ("Speed of Wealth") from approximately September 2007 to November 16, 2009.

2.      Mantria raised over $54 million from more than 300 investors from fraudulent and unregistered securities offerings.  While touting potential returns ranging from 17% to more than 450%, Mantria was in reality an elaborate Ponzi scheme, using a substantial portion of investor funds from its securities offerings to pay returns to existing investors.

3.      Mantria, through 11 operating divisions and 32 wholly-owned or affiliated companies, purported to be primarily engaged in the development of several planned residential communities in rural Tennessee, and the production and sale of "biochar" – a charcoal substitute made from organic waste.  In addition to these primary ventures, Mantria also claimed, in various investment offerings, to have diverse operations ranging from mortgage banking to hip-hop record production.

4.      Despite Mantria's supposed business empire, its operations generated no revenue with which to pay the touted extraordinary investment returns.  Instead, Mantria only paid

investor returns using offering proceeds from new investors in a classic Ponzi scheme fashion. Mantria then exhorted the paid investors to provide "testimonials" which Mantria used to lure new investors.

5.    Mantria offered its investments primarily through Speed of Wealth and its principals, Wayde McKelvy and Donna McKelvy, who advertised on television, radio, and print media to draw prospective investors to seminars, Internet "webinars", internet radio shows and telephone conference calls.  At these seminars and other presentations, investors, many elderly or new retirees, were urged to move at the "speed of wealth" by liquidating all traditional investments such as retirement plans and home equity, in order to purchase short-term Mantria securities.

6.    Mantria and Speed of Wealth, however, were not licensed to sell securities and none of their offerings complied with the requirements of the Securities Exchange Act.

7.    The Securities and Exchange Commission sued Mantria, Speed of Wealth and their principal shareholders to enjoin their scheme on November 16, 2009.  *SEC v. Mantria Corp.*, *et al.*, Civil Action No. 09-cv-02676 (D. Col. filed Nov. 16, 2009).  At the time the SEC intervened, of the more than $54 million raised by Mantria, only $790,000 remained in its 40 frozen bank accounts.

8.    On August 5, 2011, the District Court entered summary judgment against Mantria Corporation for various violations of the securities laws, including: the sale of unregistered securities, acting as unregistered broker-dealers, and fraud in the offer and sale of securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

9.      The Mantria scheme was enabled and facilitated by the acts and omissions of the defendants named herein.  While some defendants helped funnel monies for both Mantria and Speed of Wealth, others prepared the unregistered securities offerings and served as executives in charge of Mantria's daily operation.  Without their involvement, substantial assistance, and/or disregard of their responsibilities, the Mantria scheme could not have been successful and Plaintiff and the Class would not have suffered substantial losses.

## II.      JURISDICTION AND VENUE

10.      The federal claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b 5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b 5].

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, as well as 28 U.S.C. § 1332(d)(2), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which the matter in controversy is a class action in which "any member of a class of plaintiffs is a citizen of a state different from any defendant."

12.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, several of the named defendants herein reside and regularly transact business within this district.

13.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

14.     Plaintiff Touchstone Group, LLC ("Plaintiff" or "Touchstone Group") is a limited liability company organized and existing under the laws of the State of Colorado with its principal place of business in Larkspur, Colorado.  Between August – December 2008, the Touchstone Group, through its sole shareholder Dwight Stone, relied upon Mantria and Speed of Wealth's printed investment materials and invested $235,000 in Speed of Wealth and Mantria. The Touchstone Group lost $149,434.13.

## A.    The Tatum Defendants

15.     Defendant Daniel Rink ("Rink"), is an adult citizen and resident of the State of Pennsylvania.  From July 1, 2007, to November 17, 2009, Rink served on Mantria's three-person Executive Committee, which had primary control over the company's daily operation and decision making.  Rink also served as Mantria's chief financial officer ("CFO").  As CFO, according to Mantria's documents, Rink was responsible for all financial and fiscal management aspects of the Mantria operations.  Rink prepared financial statements, financial reports, and information reports.  Rink also had control of Mantria's "cash management, documentation, internal controls and planning and analysis."  During the Class Period, Rink was employed by, and acted at the direction of Tatum, LLC in performing his duties at Mantria.

16.     Defendant Tatum, LLC ("Tatum") is a limited liability company organized and existing under the law of the state of North Carolina with its principal place of business in Atlanta, Georgia.  Tatum is the largest executive services firm in the United States, which provides companies with interim executives.  At all times material hereto, Defendant Rink was an employee and/or agent of Tatum, LLC.

17.     Defendant SFN Group, Inc. ("SFN Group") is a Delaware corporation headquartered in Ft. Lauderdale, Florida.  Defendant SFN Group is the parent company of Defendant Tatum.

18.     Defendants Rink, Tatum and SFN Group are sometimes hereinafter collectively referred to as the "Tatum Defendants."  During the Class Period, the Tatum Defendants, through Defendant Rink's status as a senior executive officer of Mantria, were privy to confidential and proprietary information concerning Mantria, its operations, finances, financial condition and present and future business prospects.  The Tatum Defendants also had access to material adverse non-public information concerning Mantria, as discussed in detail below.  Because of their positions with Mantria, the Tatum Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Tatum Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Tatum Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Tatum Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Tatum Defendants were able to and did, directly or indirectly, control the conduct of Mantria's business.

20. The Tatum Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Tatum Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Tatum Defendants had the opportunity to commit the fraudulent acts alleged herein.

**B.     The Attorney Defendants**

21. Defendant Astor, Weiss, Kaplan & Mandel, LLP ("Astor Weiss") is a limited liability partnership organized and existing under the laws of the State of Pennsylvania. Astor Weiss is a Philadelphia law firm that was retained by Mantria and/or its affiliates to prepare the unregistered private placement memorandums offered to investors by the various Mantria entities. A May 19, 2009, securities offering identifies Astor Weiss as "special securities counsel" and escrow agent for Mantria. During the pendency of the scheme, Astor Weiss received at least $4.88 million in investor funds from the Speed of Wealth entities; and at least another $16.7 million directly from investors.

22. Defendant Christopher Flannery, Esquire, is an adult citizen and resident of the State of Pennsylvania. Defendant Flannery was an attorney employed by Defendant Astor Weiss who later became Mantria's Chief Legal Officer & General Counsel in July 2009. According to Mantria's documents, as Chief Legal Counsel, Defendant Flannery was responsible to ensure Mantria's "compliance with applicable statutes and regulations, [to] review[] pertinent laws and regulations, and provide[] legal advice to all company departments and staff." Defendant Flannery also served on Mantria's document "Audit Committee." During the pendency of the

scheme, Defendant Flannery funneled at least $7.22 million of investor funds through his attorney trust account.

23.     Defendant Estill & Long, LLC, is a limited liability company organized and existing under the laws of the State of Colorado.  Estill & Long is a Littleton, Colorado law firm that served as counsel to Speed of Wealth and Wayde McKelvy.  Upon information and belief, Estill & Long reviewed and reflexively approved investor questionnaires for Speed of Wealth. Regardless of the investor's sophistication, Estill & Long would approve investors as "accredited" to acquire their investment funds.  Estill & Long would then funnel investor monies from Speed of Wealth to Astor Weiss and/or Mantria.  Mantria also transferred investors monies back to Estill & Long.

**C.     Other Defendants**

24.     Defendant Steven Granoff, CPA, is an adult citizen and resident of the State of Pennsylvania.  Beginning in early 2007, Defendant Granoff served as the outside auditor for Mantria as an employee and/or agent of Krassenstein, Granoff, & Unger, LLC.  In May 2008, Defendant Granoff was named Mantria's Controller, while simultaneously maintaining his partnership in Krassenstein, Granoff, & Unger, LLC.  As Controller, Granoff reported directly to CFO, Defendant Rink and had access to all of Mantria's financial information.

25.     Defendant Krassenstein, Granoff, & Unger, LLC, is a limited liability company organized and existing under the laws of the State of Pennsylvania with its principal place of business located in Dresher, Pennsylvania.  Krassenstein employed and/or was the principal of Defendant Granoff who acted as Mantria's outside auditor and later Controller.

26.     Defendant Carbon Diversion, Inc. is a corporation organized and existing under the laws of the State of Hawaii.  Mantria transferred at least $4.8 million of investor funds to Carbon Diversion.

27.     Defendant Tracs Growth Investment is a limited liability company organized and existing under the laws of the State of Colorado.  Mantria transferred at least $750,000 of investor funds to Tracs Growth Investment.

28.     Defendants John Does 1-100 are any and all persons who Mantria or Speed of Wealth transferred investor funds to during the pendency of the scheme.  Without proper discovery, it is impossible to know all of their identities at this time.

### IV.     RELEVANT NON-PARTIES

29.     John Paul Anderson, CPA, CFA, was appointed by the Colorado District Court as Receiver over Mantria Corporation and Speed of Wealth, LLC and their subsidiaries and affiliates on April 30, 2010.

30.     Mantria Corporation was a Delaware corporation with its principal place of business in Bala Cynwyd, Pennsylvania.  Mantria purported to have 11 operating divisions and 32 wholly-owned or affiliated companies.  Mantria's business operated as a Ponzi scheme.

31.     Troy B. Wragg, was the founder, chairman of the board of directors, and chief executive officer ("CEO") of Mantria.  Wragg did not hold any securities licenses and was never associated with a registered broker-dealer.  Prior to serving as Mantria's CEO, Wragg was employed as a manager for a small janitorial services company and then as a financial adviser to a relative.  As a result of the SEC action, the Colorado District Court entered a permanent injunction against Wragg on March 29, 2011.

32.     Amanda E. Knorr, was the president, vice-chairman of the board of directors, and chief operating officer ("COO") of Mantria.  Knorr did not hold any securities licenses and she was never associated with a registered broker-dealer.  Prior to serving as Mantria's COO, Knorr was employed as a human resources manager at the same janitorial services company where

Wragg was employed.  As a result of the SEC action, the Colorado District Court entered a permanent injunction against Knorr on March 29, 2011.

33.     Speed of Wealth, LLC, was a Colorado limited liability company that advertised on the Internet, together with local television, radio, and print media to draw prospective Mantria investors to seminars nationwide.  Wayde McKelvy and Donna McKelvy were Speed of Wealth's sole members.  Speed of Wealth never registered any securities with the SEC.  Speed of Wealth never responded to the SEC's complaint and the Clerk of Court for the Colorado District Court entered default on March 15, 2011.

34.     Wayde M. McKelvy was the founder and managing member of Speed of Wealth. He was a 25% owner of Mantria Industries, LLC, one of the Mantria subsidiaries that actively raised funds from investors.  He did not hold any securities licenses, and was never associated with a registered broker-dealer.  On April 5, 2011, as a result of the SEC action, the Colorado District Court entered a permanent injunction against Wayde McKelvy.

35.     Donna M. McKelvy purportedly held the titles of president of Speed of Wealth in charge of investor relations and vice president of Speed of Wealth in charge of investor relations. She was a 25% owner of Mantria Industries, LLC, one of the Mantria subsidiaries that actively raised funds from investors.  She did not hold any securities licenses, and was never associated with a registered broker-dealer.  On December 16, 2009, as a result of the SEC action, the Colorado District Court entered a permanent injunction against Donna McKelvy.

## V.     FACTUAL BACKGROUND

### A.     The Mantria / Speed of Wealth Scheme

36.     Mantria's headquarters was located in Bala Cynwyd, Pennsylvania, and operated from a fourth-floor office suite, which occupied 1/3 of the floor.  Mantria had 55 employees, and

in addition to its Pennsylvania headquarters, maintained offices in Colorado, Florida, New York and Tennessee.

37.     From its headquarters, Mantria falsely touted itself as a budding business empire, with 11 operating divisions and 32 wholly-owned or affiliated companies.  Mantria claimed to be engaged in the development of several planned residential communities in rural Tennessee, and the production and sale of "biochar" – a charcoal substitute made from organic waste.  In addition to these primary ventures, Mantria also claimed to have diverse operations ranging from mortgage banking to hip-hop record production.

38.     Mantria enlisted the assistance Speed of Wealth, LLC and its principals, Wayde McKelvy and Donna McKelvy, who were charged with acting as the promotional vehicle for Mantria and recruit as many investors as possible.  Neither of the McKelvys, however, were licensed securities brokers or dealers.

39.     With this background, between September 2007 and November 16, 2009, Mantria and Speed of Wealth raised tens of millions of dollars from unsuspecting investors.

40.     The securities sold by Mantria to Plaintiff and other Class Members were not registered, and did not trade on any national exchange.  Despite the Exchange Act's strict requirements on the sale of unregistered securities, Mantria and Speed of Wealth failed to adhere to these regulations, and instead engaged in general solicitation of unsophisticated investors and failed to file the necessary registration statements and forms with the SEC.

41.     Mantria and Speed of Wealth used public "get rich quick" seminars to attract potential investors.  These seminars were advertised generally to the public, without restriction, by television, radio, internet, print media, and e-mail, and were attended by potential investors in person as well as by telephone conference calls and internet webinars.

42.   The seminars, Internet webinars, telephone conference calls, and Internet radio programs were open to the public and particularly marketed to the elderly, and those approaching retirement age.

43.   Mantria and Speed of Wealth used high-pressure tactics to market their securities to potential investors, frequently offering short-term incentives and bonuses to investors in various programs to induce them to "pledge" their investments, and/or to induce those who have pledged to send in their money immediately.

44.   Emphasized to potential investors was the extraordinary past investment returns earned from Mantria holdings that paid anywhere from 17% to "hundreds of percent rates of return," the safety of Mantria securities, which were claimed to be collateralized with assets valued from 100% to 400% of the amount of their investments, and the purported success of Mantria's business operations.

45.   Despite the investment requirements of Regulation D, Mantria and Speed of Wealth improperly told prospective investors that they could invest regardless of their accreditation by investing in limited liability companies established by Speed of Wealth for the sole purpose of purchasing specific Mantria securities.

46.   Unbeknownst to investors, however, Mantria and Speed of Wealth were operating an elaborate Ponzi scheme; and each securities offering contained material misstatements and omissions regarding, among other things, the status and success of Mantria's business operations, the use of investor proceeds, and the commissions and other financial interests received by Speed of Wealth.  Despite the requirements of Regulation D, none of the offerings were registered with the SEC or any state securities commission, and none of the offering materials contained audited financial statements.

47.     As an example, Mantria's offerings represented that it paid, and would continue to pay, extraordinary investment returns *from Mantria's profitable business operations*.  For example:

> a.      Promotional materials for Mantria Financials 17% promissory notes offering, dated July 1, 2008, contain a section entitled "How do we offer such high yields?" which then describes that Mantria pays such returns because it makes a profit on home site sales relating to land in Tennessee, and from financing land sale purchases.

> b.      The private placement memorandum for Mantria Industries, LLC 25% Profits Interest in Earthmate Waste Conversion System Sales, dated August 31, 2009, contains a "Return on Investment Analysis Spreadsheet" that predicts returns of 450% for investors.  The spreadsheet references estimated annual profits from, among other things, Mantria's purported sale of bio-char production systems in 2010 and 2011, net profits from annual system fees of $500,000, as well as anticipated profits from a "conservative" estimate of an initial public offering price of $9/share to reach a total estimated return of more than 450%.

48.     Despite the representation that Mantria "makes a profit on home site sales"; in reality, in 2008 and 2009, Mantria only generated $138,647 and $55,999 from land sales, respectively.

49.     To create the appearance of a profitable real estate enterprise, Mantria used investors' funds to establish its own "special purpose" bank, Mantria Financial, with the sole function of providing financing for the Tennessee land sales.

50.     With Mantria Financial, land purchasers were required to put no money down to purchase the Tennessee properties owned by Mantria Realty.  Mantria Financial also granted extraordinary grace periods on the repayment of the loans; and in some instances, land purchasers were paid an "incentive" by Mantria Financial at the time of closing.

51.     In essence, all real estate sales made by Mantria, with the exception of three, were 100% financed by Mantria Financial with investor funds and purchased from Mantria Realty

Operational Group.  In other words, Mantria was simply moving investor funds from one Mantria subsidiary to another, and never generating any real revenue.  Consequently, Mantria could only pay investor returns on its securities offerings with funds obtained from later investors because Mantria had no other significant source of cash.

52.     Moreover, while predicating returns of 450% for investors from the sale of bio-char production systems, at the time of the offering in August 2009, Mantria had not sold any biochar or had any operational biochar manufacturing systems.

53.     Mantria used millions in investor funds to construct an elaborate, non-functional biochar plant in Dunlap, Tennessee.  Other than several test batches, the facility never generated any biochar.  Instead, it was a ruse, used by Mantria to lure additional investors to purchase its securities.  Mantria went as far as to offer potential investors all expense paid trips to tour the non-operational facility.

54.     Knowing it has no source of revenue, Mantria failed to disclose to investors that it intended to use a portion of investors' funds to make principal or interest payments to other investors.  Instead, Mantria's securities and promotional materials represented that the bulk of investor funds would be used for operational and other expenses.

55.     As an example, the July 31, 2009, and August 31, 2009, Mantria offerings contained tables titled "ESTIMATED SOURCES AND USES OF FUNDS" which account for an allocation of 100% of the funds raised, but failed to disclose that Mantria used the funds to re-pay other investors.  These reported (and false) financial results were prepared by (or were the responsibility of) the controller and CFO of Mantria, Defendants Granoff and Rink (acting individually and as an employee of Defendants Tatum and SFN Group).

56.     Mantria's offerings also failed to disclose to investors that the principals of Speed of Wealth were paid a 12.5% commission for each sale completed.  Not only was the commission payment not disclosed to investors, neither Wayde nor Donna McKelvy were affiliated with a registered securities broker or dealer as required by 15 U.S.C. § 78o.

57.     Through its numerous offerings, Mantria raised approximately $54,531,488.57 from more than 300 investors.  Of that amount, Mantria paid approximately $17,500,453.21 back to investors, using investors' own funds.  Mantria also used investor funds to build and expand its non-revenue-generating infrastructure and to pay outrageous commissions and compensation to its executives.

58.     As a result, Mantria and the Defendants named herein, together with those currently unknown, profited from the Ponzi scheme in the amount of approximately $37,031,035.36 ($54,531,488.57 investor contributions less $17,500,453.21 investor distributions).

**B.      The Tatum Defendants' Role in the Scheme**

59.     Defendant Tatum holds itself out as a service provider to companies in need of a short-term CFO.  As described by Defendant Tatum's website, "[t]he sudden departure of a CFO … can have serious implications for your business."  Accordingly, "Tatum can provide an interim CFO, COO or CIO while Tatum Talent, our executive search team, conducts the search for a permanent person."  In essence, this relationship allows a company to "outsource" its CFO function to Tatum.

60.     Mantria contracted with Defendant Tatum to have Defendant Rink (an employee and partner of Tatum) function as Mantria's CFO.  At all times during the course of this engagement, Defendant Rink remained an employee and partner of Tatum, and acted on Tatum's behalf and as Tatum's agent in performing such services for Mantria.  According to the terms of

Tatum's standard Executive Services Agreement (which was obtained by Plaintiff's counsel from the files of other unrelated litigation), Mantria paid Tatum directly for Tatum's services as interim CFO of Mantria.

61.     Tatum, in addition to Defendant Rink, also had its employee and/or agent Stephen Markert assigned to Mantria to serve as a financial manager.  Mantria paid Tatum directly for Stephen Markert's services.

### 1.     Daniel Rink.

62.     Rink, acting on behalf of Tatum as a member of the Executive Committee and CFO of Mantria, had the opportunity to observe different areas of Mantria's business, including its supposed real estate and bio-char businesses.

63.     Rink participated in weekly Friday staff meetings with Wragg, Knorr, and approximately 18 to 20 other Mantria employees.  Rink also participated in weekly "meetings of the chief executives" with Wragg and Knorr.

64.     Rink knew that Mantria had not sold any biochar or had any biochar manufacturing systems, despite Mantria's repeated representations to the contrary.

65.     Rink also knew that all real estate sales made by Mantria, with the exception of three, were either financed by Mantria Financial with investor funds and purchased from Mantria Realty Operational Group.  In other words, Rink knew that Mantria was simply moving investor funds from one Mantria subsidiary to another, and never generating any real revenue.

66.     Additionally, as CFO responsible for cash flow and accounting, Rink knew that Mantria was paying an undisclosed 12.5% commission to Wayde and Donna McKelvy for each securities sale completed by Speed of Wealth.  Rink knew that these commissions were not disclosed to investors.

67.     Despite his knowledge, Rink's negligence and inaction furthered the Mantria scheme by keeping slipshod financial records making tracing investor funds, and the disposition of those funds difficult.  Of Mantria's 11 operating divisions and 32 wholly-owned or affiliated companies, only one had an audited financial statement for 2008 and 2009.

68.     As a member of the Executive Committee and CFO of Mantria, Rink, knew or should have known, that Mantria's securities offerings contained false and misleading information about the company, its investments, and that Mantria only paid the promised investor returns with offering proceeds from new investors in a Ponzi-like fashion.

**2.     Tatum, LLC.**

69.     Rink was not an employee of Mantria; he was a consultant, who at all times material hereto, was employed and/or served as an agent of Tatum LLC.

70.     Tatum hired Rink for the specific purpose of providing executive services to companies.  And Tatum actively promoted Rink's abilities on its website as "solid, consistent, [and] responsive .... financial leadership of the widest scope."

71.     Rink's corporate biography in the Mantria securities offerings also held Rink out as an employee and agent of Tatum.  Specifically, his Mantria biography stated, "[Rink] holds his current CFO role [with Mantria] while maintaining his Financial Leadership Partnership with Tatum LLC … who specialize[s] in servicing organizations undertaking significant change."

72.     It was only through Rink's employment with Tatum that he came into contact with Plaintiff and the putative Class.

73.     Tatum also directly employed Stephen Markert who served as a Financial Manager for Mantria.

C.     **Other Participants in the Scheme**

1.     **Christopher Flannery, Esquire.**

74.     Defendant Flannery was an attorney employed by Defendant Astor Weiss and later became Mantria's Chief Legal Officer & General Counsel in July 2009.

75.     Flannery has practiced securities law since 1981, handling a number of public offerings, private placements, preparing 10-Ks and 10-Qs, and completing mergers and acquisitions.  Suffice it to say, Flannery was knowledgeable about the requirements of the Exchange Act, Regulation D, registration requirements for broker-dealers, and requirements for accredited investors.

76.     Flannery's role as chief counsel for Mantria "ran the gamut" from managing outside counsel, reviewing employment contracts, the employee handbook and company leases.

77.     Flannery's office at Mantria's headquarters was situated directly next to Rink and the two interacted every day.

78.     At Mantria's nerve center, Flannery participated in weekly Friday staff meetings with Wragg, Knorr, Rink and approximately 18 to 20 other Mantria employees.  Flannery also participated in weekly "meetings of the chief executives" with Wragg, Knorr, and Rink.

79.     In addition, Flannery had weekly "legal meetings" with Wragg and Knorr, which typically lasted an hour.  Flannery often met with Wragg alone for whole days at a time.

80.     Between 2007 and November 16, 2009, Flannery, both as outside counsel employed by Astor Weiss, and chief legal counsel for Mantria, reviewed and provided legal advice on Mantria's securities offerings.  Flannery also prepared a number of Mantria's private placement memorandums, reviewed the subscription agreements to ensure investors were properly accredited, and approved investor questionnaires at closing.

81.     As a corporate executive and chief counsel charged with preparing and providing legal advice for Mantria's securities offerings, it was incumbent on Flannery to ascertain the truth of the statements asserted therein.

82.     Although he reviewed the offerings touting Mantria's real estate sales success, Flannery, admittedly, performed no independent due diligence to confirm the veracity of the securities offerings.  For example, Flannery believed that Mantria was paying investor returns using proceeds "from the sale of [land] lots," which he was told, by fellow Mantria employees, was "going reasonably well."

83.     Even minimal due diligence would have revealed to Flannery that Mantria had sold only three plots of land that resulted in a positive cash yield.  The rest of the purported real estate transactions were merely cash exchanges between Mantria Financial and Mantria Realty, with investor funds being moved from one subsidiary to another.

84.     Flannery knew that Mantria's biochar facility never went into full production and was only in the testing phase.  Despite his knowledge, Flannery reviewed and approved a Mantria securities offering dated August 31, 2009, that predicted returns of 450% for investors estimated annual profits from, among other things, Mantria's purported sale of bio-char production systems in 2010 and 2011.

85.     Flannery also structured Mantria's securities offerings as exempt offerings under Regulation D.  Flannery, however, performed no independent due diligence to determine if Mantria was actually meeting the requirements of Regulation D.

86.     Rather, Flannery merely assumed investors were being provided with offering materials that provided all the material information regarding the offering; that they met the

SEC's requirements as "accredited investors"; and that Mantria and Speed of Wealth were complying with the Exchange Act's prohibition on general solicitation and public offering.

87.     After the SEC issued its initial subpoena to Mantria, Flannery began to review the investor files and discovered that Mantria and Speed of Wealth were not selling securities to accredited investors and violating the public offering and solicitation rules.

88.     In failing to perform his independent due diligence, as alleged above, Flannery knew, or should have known, when he prepared and approved the securities offerings that they contained false and misleading information about the company and its investments and that Mantria only paid promised investor returns almost with offering proceeds from new investors.

### 2.     Astor Weiss.

89.     Defendant Astor Weiss is a Philadelphia law firm that provided legal services to Mantria and its subsidiaries; and served as "special securities counsel" to Mantria for its securities offerings.

90.     Astor Weiss employed Defendant Flannery between 1999 and July 2009.  As an Astor Weiss employee, Flannery was responsible to prepare Mantria's private placement memorandums, and to review the investor subscription agreements and purchaser questionnaires to insure that Mantria's investors met the SEC's accreditation standards.

91.     Flannery, as an employee of Astor Weiss, prepared, reviewed, and approved at least the following Mantria securities offerings:  (1) Infinite Cash Entertainment, LLC 18%, (2) Mantria Financial, LLC 17%, (3) Mantria Renewable Energy Fund, L.P., and (4) Mantria Place Renewable Energy Site Development, L.P.

92.     For each offering, Flannery as an employee of Astor Weiss also reviewed and approved the investor subscription documents and purchaser questionnaires.

**3.** **Estill & Long.**

93.     Estill & Long acted as the law firm to Speed of Wealth and Wayde and Donna McKelvy.  Upon information and belief, Estill & Long approved applications and securities sales to unsophisticated investors in direct contravention to the SEC requirements regarding accredited investors.

94.     Estill & Long would then funnel investor monies from Speed of Wealth to Astor Weiss and/or Mantria.  Mantria also transferred defrauded investors monies back to Estill & Long.

95.     Plaintiff Touchstone Group, received "interest" payment checks directly from the "ESTILL AND LONG LLC TRUST DEED GROUP I LLC, ESCROW" account between April 2008 and May 2009.  Estill & Long's employee, Karen Fleming, signed each check on behalf of Mantria.

96.     Estill  & Long also issued correspondence to investors as "SOW Hard Money Loans II, LLC" from its offices in Littleton, Colorado.  And acted as the registered agent for several of the Mantria / Speed of Wealth entities, including the May 5, 2009, "SOW Mantria 25% LLC."

**4.** **Steven Granoff and Krassenstein, Granoff, & Unger, LLC.**

97.     Beginning in early 2007, Defendant Granoff served as the outside auditor for Mantria as an employee and/or agent of Krassenstein, Granoff, & Unger, LLC.

98.     In May 2008, Defendant Granoff was named Mantria's controller, while simultaneously maintaining his partnership in Krassenstein, Granoff, & Unger, LLC.  As controller, Granoff reported directly to CFO, Defendant Rink and had access to all of Mantria's financial information.

99.     Granoff, as auditor and controller, assisted Rink in the preparation of Mantria's financial statements.  In so doing, Granoff knew, or should have known, that Mantria was not earning any profit, but rather simply moving investor funds from one subsidiary to another.

100.    Nonetheless, Granoff, as an employee and/or agent of Krassenstein, repeatedly prepared financial statements for inclusion in the securities offerings showing Mantria as a profitable business, earning monies from the sale of bio char and real estate.

## VI.     CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class defined as all persons or entities who invested in any securities issued or promoted by Mantria Corporation or Speed of Wealth, LLC, or any of their subsidiaries or affiliates since September 2007 and incurred a net loss of their investments (the "Class").  Excluded from the Class are Defendants, Mantria Corporation, Speed of Wealth LLC and any of their officers, employees, or affiliates.

102.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least 300 Class members.

103.    There are questions of law and fact common to the Class, including:

a.      Whether the Defendants received funds from Speed of Wealth and/or Mantria that are traceable to Plaintiffs and the Class;

b.      Whether the transfers of funds by Speed of Wealth and/or Mantria to the Defendants were made with the actual intent to hinder, delay and defraud Plaintiff and the Class;

c.      Whether the transfers of funds by Speed of Wealth and/or Mantria to the Defendants were made without reasonably equivalent value in exchange for the transferred funds;

d.      Whether any or all of the Defendants can establish, as an affirmative defense, that they are good faith transferees;

e.      The proper measure of relief to remedy the harm suffered by Plaintiff and the Class;

f.      Whether the Defendants were unjustly enriched;

g.      Whether Rink and Flannery were negligent in misrepresenting Mantria's financial wherewithal;

h.      Whether Rink and Flannery's negligence was a proximate cause of Plaintiff and the Class's harm;

i.      Whether Astor Weiss and Tatum LLC are vicariously liable for the acts of their agents/employees Flannery and Rink;

j.      Whether Rink and Flannery are controlling persons under Section 20(a) of the Exchange Act;

k.      Whether Rink, Flannery and Astor Weiss, are liable under the Pennsylvania Securities Act for aiding Mantria in securities violations; and

l.      Whether Estill & Long is liable under the Colorado Securities Act for aiding and abetting Speed of Wealth in securities violations.

104.    Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff's interests are aligned with, and not antagonistic to, other members of the Class.

105.    Plaintiff is represented by counsel who is competent and experienced in the prosecution of consumer and investor class action litigation.

106.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

107.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## VII.    NO SAFE HARBOR

108.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Mantria who knew that those statements were false when made.

## VIII.   EQUITABLE TOLLING

109.    On April 30, 2010, the Colorado District Court issued an order that appointed John Paul Anderson, CPA, CFA, as Receiver over Defendant Mantria Corporation and its subsidiaries and affiliates, together with Speed of Wealth and its subsidiaries and affiliates.

110.    The Court's April 30, 2010 Order, stayed all civil legal proceedings of any nature involving:  (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature whether as plaintiff, defendants, third-party plaintiff, third-party defendant, or otherwise.

111.    On September 13, 2011, the SEC filed an "Unopposed Motion for Expedited Hearing Regarding Whether to Modify the Stay of Litigation Imposed by the Order Appointing Receiver."  In response to that motion, on September 20, 2011, the Colorado District Court modified the stay of civil litigation set forth in its April 30, 2010 Order and lifted the stay against the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners.

112.    Until the Court lifted the stay of civil proceedings on September 20, 2011, Plaintiff and the putative Class were prevented from asserting their rights against the Defendants. As such, and to the extent necessary, the statute of limitations for all causes of action were tolled by the Colorado District Court's April 30, 2010 Order.

## IX.   CAUSES OF ACTION

### COUNT I

**Violation Of Section 10(B) Of The Exchange Act
And Rule 10b-5 Promulgated Thereunder
Against The Tatum Defendants, Defendant Flannery And Defendant Granoff**

113.    Plaintiff repeats, reiterates, and realleges each and every allegation contained above as if fully set forth herein.

114.    During the Class Period, the above named Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.    The above named Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

116.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mantria common stock.  Plaintiff and the Class would not have purchased Mantria securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

117.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Mantria securities during the Class Period.

## COUNT II

### Violation Of Section 20(A) of The Exchange Act
### Against The Tatum Defendants and Defendants Flannery and Granoff

118.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.   Defendants Rink and Flannery were senior executives of Mantria Corporation and its affiliates.

120.   Defendant Rink, acting individually and in his capacity of an employee of Defendants Tatum and SFN Group, served on Mantria's three-person Executive Committee, together with Troy Wragg and Amanda Knorr, and exercised primary control over the company's daily operation and decision making.  Rink also served as the chief financial officer of Mantria Corporation.  As CFO, Mr. Rink had control of Mantria's "cash management, documentation, internal controls and planning and analysis."

121.   Defendant Flannery was Mantria's Chief Legal Officer & General Counsel. Defendant Flannery was responsible to ensure Mantria's "compliance with applicable statutes and regulations, [to] review[] pertinent laws and regulations, and provide[] legal advice to all company departments and staff."  Defendant Flannery also served on Mantria's document "Audit Committee."

122.   Both Rink and Flannery participated in Friday weekly staff meetings with Wragg, Knorr, and approximately 18 to 20 other Mantria employees.  Rink and Flannery also both participated in weekly "meetings of the chief executives" with Wragg and Knorr.

123.   Defendants Rink and Flannery had direct access to, and were charged with the responsibility of monitoring Mantria's cash flow, together with ensuring internal control and compliance with applicable statutes and regulations.  Defendants Rink and Flannery were

reckless in not knowing that Mantria was involved in fraudulent conduct and issued unregistered and unlicensed securities, and used investor funds to pay yields to other investors in a Ponzi-scheme fashion.

124.    Accordingly, the Tatum Defendants, Defendant Flannery and Defendant Granoff acted as controlling persons of Mantria within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Mantria, and their ownership of Mantria, the Tatum Defendants, Defendant Flannery and Defendant Granoff had the power and authority to cause Mantria to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Tatum Defendants and Defendants Flannery and Granoff are liable pursuant to Section 20(a) of the Exchange Act.

<strong>COUNT III</strong>

<strong>Avoidance of and Recovery of Fraudulent Transfers Pursuant to the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA") 12 PA. CON. STAT. § 5101, <em>et seq.</em><br>Against All Defendants</strong>

125.    Plaintiff repeats, reiterates, and realleges each of the allegations set forth above.

126.    Plaintiff and Class members are creditors of Speed of Wealth or Mantria within the meaning of PUFTA, 12 PA. CON. STAT. § 5101(b)

127.    Speed of Wealth and Mantria are responsible to reimburse all funds defrauded from Plaintiff and the Class in connection with the Ponzi scheme alleged herein.  Speed of Wealth and Mantria are insolvent, however, as a result of, among other things, the transfer of funds traceable to the Defendants.

128.    The Defendants received monies from Speed of Wealth and Mantria as described above.

129.    Speed of Wealth and Mantria's transfer of funds to the Defendants were fraudulent under the "actual fraud" provision of PUFTA, 12 PA. CON. STAT. § 5104(a)(1) in that

they were made with the actual intent to hinder, delay and defraud Plaintiff and the Class, who were creditors of Speed of Wealth or Mantria.

130.    Speed of Wealth and Mantria's transfer of funds to the Defendants were also fraudulent under the "constructive fraud" provision of PUFTA, 12. PA. CON. STAT. § 5104(a)(2) in that the transfers were made without the exchange of reasonably equivalent value, that is, without fair consideration.

131.    Pursuant to PUFTA, 12 PA. CON. STAT. § 5107, Speed of Wealth and Mantria's transfer of all funds to the Defendants are voidable transfers to the extent necessary to satisfy the claims of Plaintiff and the Class.

132.    Plaintiff and Class members are entitled to recover relief from the Defendants to remedy their losses, with interest as provided by law from the date of each payment.

133.    WHEREFORE, Plaintiffs demand judgment against Defendants, on their own behalf and on behalf of the Class members, for remedies available under PUFTA, 12 PA. CON. STAT. § 5107, to recover the amount of the fraudulent transfers to each Defendant, plus interest from the dates of the transfers, costs, and reasonable attorneys' fees.

## COUNT IV

### Avoidance of And Recovery of Fraudulent Transfers Pursuant to the Colorado Uniform Fraudulent Transfer Act ("CUFTA") COLO. REV. STAT. § 38-8-101, *et seq.* Against All Defendants

134.    Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

135.    Plaintiff and Class members are creditors of Speed of Wealth and Mantria Industries within the meaning of CUFTA, COLO. REV. STAT. § 38-8-102(5)(2011).

136.    Speed of Wealth and Mantria are responsible to reimburse all funds defrauded from Plaintiff and the Class in connection with the Ponzi scheme alleged herein.  Speed of

Wealth and Mantria are insolvent, however, as a result of, among other things, the transfer of funds traceable to the Defendants.

137. The Defendants received monies from Speed of Wealth and Mantria as described above.

138. Speed of Wealth and Mantria's transfer of funds to the Defendants were fraudulent under the "actual fraud" provision under CUFTA, COLO. REV. STAT. § 38-8-105(1)(a), in that they were made with the actual intent to hinder, delay and defraud Plaintiff and the Class, who were creditors of Speed of Wealth or Mantria.

139. Speed of Wealth and Mantria's transfer of funds to the Defendants were also fraudulent under the "constructive fraud" provision of CUFTA, COLO. REV. STAT. § 39-8-105(1)(b), in that the transfers were made without the exchange of reasonably equivalent value, that is, without fair consideration.

140. Pursuant to CUFTA, COLO. REV. STAT. § 38-8-108(1)(a), Speed of Wealth and Mantria's transfer of all funds to the Defendants are voidable transfers to the extent necessary to satisfy the claims of Plaintiff and the Class.

141. Plaintiff and Class members are entitled to recover relief from the Defendants to remedy their losses, with interest as provided by law from the date of each payment.

142. WHEREFORE, Plaintiffs demand judgment against Defendants, on their own behalf and on behalf of the Class members, for remedies available under CUFTA, to recover the amount of the fraudulent transfers to each Defendant, plus interest from the dates of the transfers, costs, and reasonable attorneys' fees.

## COUNT V

### Unjust Enrichment
### Against All Defendants

143.     Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

144.     Plaintiff and Class members conferred benefits upon the Defendants in the form of their investments with Speed of Wealth and Mantria that were transferred by Speed of Wealth and Mantria to the Defendants.

145.     Defendants have retained funds traceable to Plaintiff and the Class.

146.     It would be inequitable to allow the Defendants to retain those benefits without payment of value in return to Plaintiff and Class members.

147.     The Defendants have been unjustly enriched and must be compelled to pay restitution and disgorge the amount of their unjust enrichment.

148.     Plaintiff demand judgment against Defendants, on its own behalf and on behalf of the Class members.

## COUNT VI

### Information Negligently Supplied For The
### Guidance of Others/Negligent Misrepresentation
### Against The Tatum Defendants

149.     Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

150.     Rink was a consultant who at all times materially hereto was employed by and/or an agent of Defendant Tatum.

151.     Tatum had an agreement and billed Mantria monthly for services provided by Rink.

152.     During the course and scope of his employment as an employee of Tatum, Rink prepared and reviewed Mantria's financial statements, which contained negligent misstatements about, *inter alia*, Mantria's financial stability, its wherewithal to re-pay investors, and projected revenues.

153.     Based on the doctrines of apparent or actual authority, imputed liability, and/or respondent superior, Tatum is vicariously responsible for Rink's negligent misrepresentations regarding Mantria's financial stability and projected revenues, which induced Plaintiff and the Class to purchase the Mantria securities.

154.     Rink, in his individual capacity and as an employee of Tatum and SFN Group, while acting as CFO and executive committee member of Mantria, was responsible for all financial and fiscal management aspects of the Mantria operations.  The Tatum Defendants were responsible to prepare financial statements, financial reports, and information reports for Mantria.

155.     The Tatum Defendants were aware that Mantria's financial statements, reports, and information prepared for the securities offerings were intended to inform investors about Mantria's financial condition; and that investors would rely upon the information contained therein in making investment decisions.

156.     The Tatum Defendants negligently misrepresented Mantria's financial statements, reports and information which misrepresentations were intended for the benefit and guidance of the Mantria investors, including Plaintiff and the Class.

157.     As a result, the Tatum Defendants owed a duty of due diligence in making each statement, and in turn, Plaintiff and the Class had a reasonable expectation that the statements contained in the Mantria securities offerings were accurate.

158.    Plaintiff and the Class relied on the accuracy of the Mantria securities offerings in making their investments.

159.    As a direct and proximate result of Rink negligent misrepresentations, Plaintiff and the putative Class have suffered actual damages.

### COUNT VII

**Information Negligently Supplied For The
Guidance of Others/Negligent Misrepresentation
Against Defendant Flannery**

160.    Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

161.    Flannery, in preparing the Mantria securities offerings, negligently misrepresented facts, *inter alia*, regarding Mantria's financial stability, its wherewithal to re-pay investors, and its projected revenues.

162.    Moreover, the Mantria securities offerings negligently misrepresented to investors that the offering was exempt from both SEC and state registration when it was not.

163.    Each negligently misrepresented statement made by Flannery was intended for the benefit and guidance of the Mantria investors, including Plaintiff and the Class.

164.    As a result, Flannery owed a duty of due diligence in making each statement, and in turn, Plaintiff and the Class had a reasonable expectation that the statements contained in the Mantria securities offerings were accurate.

165.    Plaintiff and the Class relied on the accuracy of the Mantria securities offerings in making their investments.

166.    As a direct and proximate result of Flannery's negligent misrepresentations, Plaintiff and the putative Class have suffered actual damages.

## COUNT VIII

### Vicarious Liability For Information Negligently Supplied For
### The Guidance of Others/Negligent Misrepresentation
### Against Defendant Astor, Weiss, Kaplan & Mandel, LLP

167.    Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

168.    Between 1999 and July 2009, at all times during the scheme, Defendant Flannery was an attorney employed by the law firm of Defendant Astor Weiss.

169.    Flannery worked with, and reported to, Astor Weiss attorneys Michael Renner and David Mandel.

170.    Astor Weiss had a retainer agreement with Mantria and billed Mantria monthly for services rendered by Flannery.

171.    During the course and scope of his employment as an attorney with Astor Weiss, Flannery prepared and reviewed Mantria's securities offerings, which contained negligent misstatements about, *inter alia*, Mantria's financial stability, its wherewithal to re-pay investors, projected revenues, and exemptions from both SEC and state registration.

172.    Based on the doctrines of apparent or actual authority, imputed liability, and/or respondent superior, Astor Weiss is vicariously responsible for Flannery's negligent misrepresentations regarding Mantria's financial stability and projected revenues, which induced Plaintiff and the Class to purchase the Mantria securities.

173.    Plaintiff and the Class are entitled to recover from Astor Weiss their damages suffered as a result of said conduct by Flannery and the application of said doctrines.

## COUNT IX

### Information Negligently Supplied For The
### Guidance of Others/Negligent Misrepresentation
### Against Defendant Stephen Granoff, CPA

174.     Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

175.     Granoff, in preparing financial statements for the Mantria securities offerings, negligently misrepresented facts, *inter alia*, regarding Mantria's financial stability, its wherewithal to re-pay investors, and its projected revenues.

176.     Each negligently misrepresented statement made by Granoff was intended for the benefit and guidance of the Mantria investors, including Plaintiff and the Class.

177.     As a result, Granoff owed a duty of due diligence in making each statement, and in turn, Plaintiff and the Class had a reasonable expectation that the statements contained in the Mantria securities offerings were accurate.

178.     Plaintiff and the Class relied on the accuracy of the Mantria securities offerings in making their investments.

179.     As a direct and proximate result of Granoff's negligent misrepresentations, Plaintiff and the putative Class have suffered actual damages.

## COUNT X

### Vicarious Liability For Information Negligently Supplied For The
### Guidance of Others/Negligent Misrepresentation
### Against Defendant Krassenstein, Granoff, & Unger, LLC

180.     Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

181.    Between 2007 and November 2009, at all times during the scheme, Defendant Granoff was an employee and/or agent of the accounting firm Krassenstein, Granoff, & Unger, LLC.

182.    During the course and scope of his employment as an accountant with Krassenstein, Granoff, Granoff prepared and reviewed Mantria's financial statements, which contained negligent misstatements about, *inter alia*, Mantria's financial stability, its wherewithal to re-pay investors, and projected revenues.

183.    Based on the doctrines of apparent or actual authority, imputed liability, and/or respondent superior, Krassenstein, Granoff is vicariously responsible for Granoff's negligent misrepresentations regarding Mantria's financial stability and projected revenues, which induced Plaintiff and the Class to purchase the Mantria securities.

184.    Plaintiff and the Class are entitled to recover from Krassenstein, Granoff their damages suffered as a result of said conduct by Granoff and the application of said doctrines.

## COUNT XI

### Violation Of 70 P.S. § 1-503(A), Pennsylvania Securities Act of 1972 Against The Tatum Defendants And Defendants Flannery, Granoff And Astor, Weiss, Kaplan & Mandel, LLP

185.    Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

186.    Defendants Rink, Granoff and Flannery were partners, principal executive officers and/or directors of Mantria Corporation.  During the Class Period, the Tatum Defendants (through Defendant Rink's status as a senior executive officer of Mantria), and Defendants Granoff and Flannery were privy to confidential and proprietary information concerning Mantria, its operations, finances, financial condition and present and future business prospects.  The Tatum Defendants and Defendants Granoff and Flannery also had access to material adverse

non-public information concerning Mantria, as discussed in detail below.  Because of their positions with Mantria, these Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

187.    Defendant Astor Weiss served Mantria Corporation as "special securities counsel" in preparing offering memorandums and effectuating the purchase and sale of securities by accepting monies from investors on behalf of Mantria, and therefore, served as an agent of Mantria Corporation as defined in 70 P.S. § 1-102.

188.    70 P.S. § 1-401 is modeled after Rule 10b-5 of the federal securities laws and requires virtually the same elements of proof.  Mantria Corporation has been found liable for a violation of Rule 10b-5 for its offering and sale of fraudulent securities.

189.    Pursuant to 70 P.S. § 1-503(a), Defendants Rink, Flannery, Granoff and Astor Weiss are joint and severally liable to Plaintiff and the Class for materially aiding Mantria Corporation in the acts and transactions which constitute violations of 70 P.S. §1-401 and Rule 10b-5.

190.    As a direct and proximate result of the Tatum Defendants' and Defendants Flannery and Astor, Weiss's wrongful conduct, Plaintiff and the Class suffered damages in connection with their acquisition of securities from Mantria Corporation.

## COUNT XIV

### Violation Of C.R.S §11-51-604(5)(C), Colorado Securities
### Act, Aiding and Abetting
### Against Defendant Estill & Long

191.     Plaintiff and Class members repeat, reiterate, and reallege each of the allegations set forth above.

192.     At all times material hereto, and upon information and belief, Estill & Long acted as legal counsel to Speed of Wealth.  In this role, Estill & Long provided legal advice to Wayde and Donna McKelvy, reviewed and approved potential investor questionnaires, and accepted investor monies.

193.     Estill & Long knew that Wayde and Donna McKelvy were unregistered broker-dealers who were selling securities.

194.     Estill & Long knew that Speed of Wealth was engaging in general solicitation of potential investors for Speed of Wealth.

195.     In reviewing investor questionnaires, Estill & Long knew that investors were not properly accredited to invest in the Mantria / Speed of Wealth securities offerings.

196.     Estill & Long knowingly accepted monies from investors who were generally solicited by Speed of Wealth and not properly accredited.

197.     By engaging in said acts, Estill & Long gave substantial assistance to Speed of Wealth, Wayde and Donna McKelvy in violating both federal and Colorado securities laws, C.R.S. §11-51-501.

198.     As such, Estill & Long is jointly and severally liable to Plaintiff and the putative Class for all losses resulting from their investments in Speed of Wealth and Mantria.

### X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class respectfully request that this Court:

A.      Certify the Class pursuant to Rule 23(b)(3) of the Federal Rules of Civil

Procedure;

B.      Appoint Saltz, Mongeluzzi, Barrett & Bendesky, P.C. as Class Counsel pursuant

to Rule 23(g) of the Federal Rules of Civil Procedure;

C.      Enter judgment in favor of the Plaintiff and the Class and against the Defendants;

D.      Award relief to Plaintiff and the Class that remedies their losses;

E.      Award attorney fees, and costs as permitted by law; and

F.      Grant such other and further relief as the Court may deem just and appropriate.

## XI.     JURY DEMAND

Plaintiff and the Class demand a jury trial on all issues so triable.

Respectfully submitted,

Dated:  November15, 2011

HAGENS BERMAN SOBOL SHAPIRO LLP


By: s/Leif Garrison
LEIF GARRISON
2301 E. Pikes Peak Avenue
Colorado Springs, CO 80909
Tel. (719) 635-0377
Fax. (719) 635-2920
leif@hbsslaw.com

Anthony D. Shapiro
Karl P. Barth
HAGENS BERMAN SOBOL SHAPIRO LLP
1918Eighth Avenue, Suite 3300
Seattle, WA98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
tony@hbsslaw.com
karlb@hbsslaw.com

Simon B. Paris
Patrick Howard
Charles J. Kocher
SALTZ, MONGELUZZI, BARRETT & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel (215) 575-3986
Fax (215) 575-3894
E-mail: sparis@smbb.com
E-mail: phoward@smbb.com
E-mail: ckocher@smbb.com

*Attorneys for Plaintiff, Touchstone
Group, LLC and the putative Class.*